**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

<table>
<tr><td>

AFGHAN YAR INTERNATIONAL
CONSTRUCTION COMPANY LIMITED
d/b/a ACCL INTERNATIONAL, *et al.*,

     Plaintiffs,

    v.

UNITED STATES DEPARTMENT OF
STATE,

     Defendant.

</td><td>

Civil Action No. 21-1740 (CKK)

</td></tr>
</table>

**MEMORANDUM OPINION**
(August 6, 2021)

Afghan Yar International Construction Company Limited and Afghan Yar International Logistics Services Company (collectively doing business as "ACCL International") are diversified multinationals that contract with the United States government, including with the State Department, in Afghanistan.  On June 30, 2021, ACCL International sued the State Department claiming that it caused a *de facto* debarment of ACCL International, in violation of certain federal debarment regulations.  ACCL International simultaneously moved for a preliminary injunction to reverse the effects of the State Department's alleged *de facto* debarment.  Upon consideration of the pleadings, the relevant legal authorities, and the record as a whole,[1] the Court will **DENY** ACCL International's [4] Motion for a Preliminary Injunction.

---

[1] This Memorandum Opinion focuses on the following documents:
- Compl., ECF No. 1;
- Pls.' Mem. in Supp. of Mot. for Preliminary Inj. ("Pls.' Mot."), ECF No. 4;
- Def.'s Opp'n to Mot. for Preliminary Inj. ("Def.'s Opp'n"), ECF No. 10;
- Pls.' Reply in Supp. of Mot. for Preliminary Inj., ("Pls.' Reply"), ECF No. 12;
- Def.'s Response to Pls.' Reply in Supp. of Mot. for Preliminary Inj., ("Def.'s Reply"), ECF No. 15; and,
- Administrative Record ("ACCL-UC"), ECF No. 17–22.

In an exercise of its discretion, the Court finds that holding oral argument in this action would not be of assistance in rendering a decision. *See* LCvR 7(f).

# I.   BACKGROUND

## A.  State Department Vetting

The State Department is responsible for funding and overseeing numerous international programs and contracts.  But before financing these global programs and contracts, the State Department understandably requests that its various bureaus "assess the likelihood" that such government funding will incidentally benefit terrorists or terrorist organizations.  ACCL-UC at 1.  To safeguard against this concern, the State Department directs its bureaus to establish risk mitigation measures, which will neutralize the risk of inadvertent terrorist financing.  *See id.*; Farrell Decl., ECF No. 10-1, at ¶ 4.  One such mitigation measure that the State Department has developed is a counterterrorism namecheck vetting system for government contractors, operated by the Office of Risk Analysis Management ("RAM"), within the State Department's Bureau of Administration.  *See* Farrell Decl., ECF No. 10-1, at ¶¶ 2–4.  RAM currently conducts counterterrorism namecheck vetting "for certain programs and activities in Afghanistan, Syria, Pakistan, Iraq, Lebanon, the West Bank/Gaza, Yemen, and for the Near East Regional Democracy Program and programs implemented by the Global Engagement Center."  *Id.* at ¶ 3.  Counterterrorism namecheck vetting, however, is not required for all State Department programs within these countries, nor is RAM namecheck vetting required for all State Department programs globally.  *Id.* at ¶ 4.

To administer its system of namecheck vetting, the State Department's RAM office collects contractor personnel data and cross-references it against relevant databases reflecting known terrorist organizations, members, and affiliates.  *See* ACCL-UC at 4.  Where applicable, RAM conducts namecheck vetting before the State Department awards contracts and periodically thereafter, including in the event of significant personnel change by a government contractor.  *See*

*id.* at 5.  If namecheck vetting uncovers "derogatory" information, then RAM will inform the State Department bureau responsible for the particular contract or program under review.  *See id.* at 4; Farrell Decl., ECF No. 10-1, at ¶ 6.  It is then the responsibility of that specific State Department bureau, at the direction of its Assistant Secretary, to determine the ultimate effect of the "derogatory" material uncovered.  *See* Farrell Decl., ECF No. 10-1, at ¶ 5; ACCL-UC at 4.  Based on the risk factors associated with the State Department program in question, a bureau may decide to refuse a government contract because of derogatory material or, instead, to issue an award despite the existence of that material.  *See* Farrell Decl., ECF No. 10-1, at ¶ 5.  "The State Department does not maintain a 'blacklist' of prohibited partners based on counterterrorism namecheck vetting."  *Id.* at ¶ 10.

## B.  ACCL International Subcontracts

Afghan Yar International Construction Company Limited ("Afghan Yar Construction") and Afghan Yar International Logistics Services Company ("Afghan Yar Logistics") are diversified multinational companies incorporated under the laws of Afghanistan and headquartered in Kabul, Afghanistan.  *See* Pirzada Decl., ECF No. 4-1, at ¶ 4.  Afghan Yar Construction and Afghan Yar Logistics, known collectively as "ACCL International," carry out global operations and maintain offices in Germany, Iraq, and the United Arab Emirates.  *Id.* at ¶¶ 3–4.  Mr. Habibullah Pirzada, a native and citizen of Afghanistan, is the President and owner of ACCL International.  *Id.* at ¶¶ 1–2.  Mr. Pirzada runs ACCL International with the assistance of his brothers, Mr. Mukhsen Mokhammad, who oversees ACCL International's operations in the UAE, and Mr. Mahmood Pirzada, who oversees ACCL International's operations in Afghanistan.  *Id.* at ¶ 3.

"Since 2006, the majority of ACCL International's business [has been] U.S. government-related." *Id.* at ¶ 17.  In particular, ACCL International has performed services in support of the United States government and its operations in Afghanistan, through subcontracts with prime contractors of both the State Department and Defense Department. *Id.* at ¶ 5.  For example, ACCL International has "provided food and other vital life support to United States diplomats and armed forces personnel serving . . . in Afghanistan pursuant to subcontracts with prime contractors of the State Department." *Id.*  And "[o]ver the past decade, ACCL International has received more than 60 letters from a variety of sources, including the State Department, commending, recommending, or otherwise praising ACCL International's performance and expertise." *Id.* ¶ 6.

The present case involves a dispute over ACCL International's subcontracts with two of the State Department's prime contractors in Afghanistan.  First, ACCL International maintained a subcontract in Afghanistan with a prime contractor called DynCorp International LLC ("DynCorp").  The State Department originally awarded a prime contract to DynCorp in 2014 for the Afghanistan Life Support Services ("ALiSS") contract, to service the United States embassy in Kabul.  *See* Stever Decl., ECF No. 10-5, at ¶¶ 4–5.  Although performance on this prime contract ended in September 2020, *see id.* at ¶ 5, DynCorp is currently serving on an interim "bridge" contract for the ALiSS prime contract, until the Department of State is able to award a new competitive "follow-on ALiSS contract," *id.* at ¶ 8.  On this ALiSS bridge contract, DynCorp has subcontracted with ACCL International for "food services" to be provided to the embassy in Kabul.  *Id.* at ¶ 9; *see also* Merrill Decl., ECF No 10-4, at ¶ 5; ACCL-UC at 425.  ACCL International's current ALiSS subcontract is operative between August 20, 2020 and August 19, 2021.  *Id.*  According to ACCL, however, "[t]he State Department will soon award a renewal of

the ALiSS contract" that has an expected "base period commencing on 20th August 2021, with four option years" thereafter.  Pirzada Suppl. Decl., ECF No. 12-1, at ¶ 7.

ACCL International also maintained subcontracts with another State Department contractor called Pacific Architects and Engineers, Inc. ("PAE").  In 2018, the State Department awarded PAE a task order, labeled as the "SaSS Task Order," under which PAE was to provide "security and mission support services" for the State Department in Afghanistan.  Menard Decl., ECF No. 10-3, at ¶¶ 4–5.  Under the SaSS Task Order, PAE subcontracted with ACCL International to provide "facility, operations, maintenance, and life support services" for the State Department's Criminal Justice Task Force and its Counter Narcotics Justice Center, Sensitive Investigative Unit, and National Interdiction Unit Compounds in Kabul, Afghanistan.  Pirzada Decl., ECF No. 4-1, at ¶ 14.  ACCL's most recent subcontract with PAE on the SaSS Task Order was originally to remain operative until September 18, 2021.  Pirzada Suppl. Decl., ECF No. 12-1, at ¶ 10.

Finally, in addition to the SaSS Task Order, PAE also holds a prime contract with the State Department for "operations and maintenance" services at the embassy in Kabul (the "O&M Contract").  Jackson Decl., ECF No. 10-2, at ¶ 4.  In support of its O&M Contract, PAE awarded ACCL International two small subcontracts.  *See id.* at ¶ 6.  One of ACCL's O&M subcontracts was to perform painting work on the exterior of the United States embassy in Kabul.  *Id.*  Similarly, ACCL's second O&M subcontract involved painting work on the Marine Security Guard Quarters and Arian Buildings in the U.S. Embassy Compound in Kabul.  *Id.*  Both of ACCL International's O&M subcontracts with PAE terminated on July 31, 2021.  *Id.*

Each of ACCL International's subcontracts with DynCorp and PAE was subject to a personnel background vetting provision.  Section H.16 of ACCL's ALiSS subcontract with

DynCorp states: "Contractors shall advise the Contracting Officer of any changes in personnel listed in DS Form 4184 and shall provide vetting information on new individuals. The Government reserves the right to vet these personnel changes and to terminate contracts for convenience based on vetting results." ACCL-UC at 478. Section H.17 of PAE's O&M Contract with the State Department contains an identical vetting provision. *See id.* at 679. Lastly, Section 8.8.1.1 of the SaSS Task Order with PAE subjects all subcontractors thereunder to security vetting requirements, including that "all personnel meet the approved criteria and satisfactorily complete all screening and selection process requirements." *Id.* at 572.

## C. Derogatory Material on ACCL International

The State Department's RAM office conducted counterterrorism namecheck vetting on ACCL International, with respect to certain of its contracts and awards. *See* Farrell Decl., ECF No. 10-1, at ¶ 7. In February 2021, a State Department officer named Mr. Patrick Merrill was informed that RAM had uncovered derogatory information about ACCL International. *See* Merrill Decl., ECF No. 10-4, at ¶ 3. Mr. Merrill serves as the Post Management Officer for Afghanistan within the Joint Executive Office for Near Eastern Affairs and South and Central Asian Affairs, which is responsible for the State Department's diplomatic platform in Afghanistan. *See id.* at ¶¶ 1–2. On February 23, 2021, Mr. Merrill visited the RAM office and reviewed the derogatory information on ACCL International, which has been classified at a Top Secret level. *Id.* at ¶ 4. To date, the State Department has publicly disclosed only that the derogatory material on ACCL International indicates that the company has "contracted with the enemy." Ervin Decl., ECF No. 12-2, at ¶ 6.

Sometime between February and April 2021, Mr. Merrill provided a Secret-level summary of this derogatory information to "select members of the Management Section" at the Kabul

embassy, as well as to individuals from the Joint Executive Office for Near Eastern Affairs and South and Central Asian Affairs and the Bureau of Administration, Office of the Procurement Executive, Office of Acquisitions and Management.  Merrill Decl., ECF No. 10-4, at ¶ 5.  Upon review, the South and Central Asian Affairs ("SCA") Bureau determined that because of the derogatory information uncovered by RAM, ACCL International should not serve as a subcontractor for the ALiSS contract for services at the embassy in Kabul.  *Id.*

In April 2021, Mr. Merrill conveyed the SCA Bureau's decision regarding ACCL International to Mr. John Stever, the Division Director for World Wide Contracts, within the State Department's Bureau of Administration, Office of the Procurement Executive, Office of Acquisitions Management.  *See id.* at ¶ 6; Stever Decl., ECF No. 10-5, at ¶ 1.  As Division Director for Worldwide Contracts, Mr. Stever is responsible for the State Department's acquisition program and contract operations.  Merrill Decl., ECF No. 10-4, at ¶ 6.  In April 2021, Mr. Stever contacted the Vice President of Contracts for DynCorp and informed him that the State Department had uncovered derogatory information on ACCL International that would require DynCorp to "sever its relationship with ACCL with regard to the ALiSS contract."  Stever Decl., ECF No. 10-5, at ¶ 11.  Mr. Stever's discussions with DynCorp regarding ACCL International were specific to the State Department's ALiSS contract in Afghanistan.  *Id.* at ¶ 14.  In response to Mr. Stever's directive, DynCorp proposed keeping ACCL International as a subcontractor on the ALiSS contract until the end of its term in August 2021, and then declining to renew ACCL International's subcontract going forward.  *Id.* at ¶ 12.  Mr. Stever approved of this approach, *see id.*, and on April 29, 2021, DynCorp provided ACCL International with a Notice of Disposition from DynCorp declaring that DynCorp would not exercise its renewal options with ACCL International under the ALiSS contract, *see* Pirzada Decl., ECF No. 4-1, at ¶ 13.

The derogatory information RAM uncovered on ACCL International also impacted the company's subcontracts with PAE.  In April 2021, Mr. Stever notified a member of PAE's Client Executive and Advisory Council that the State Department had uncovered derogatory information on ACCL International.  *See* Stever Decl., ECF No. 10-5, at ¶ 15.  Subsequently, the State Department contracting officer assigned to the O&M Contract informed PAE that it could retain its subcontracts with ACCL International through July 31, 2021, but that it should not exercise ACCL's next option year for either of ACCL's O&M subcontracts.  Jackson Decl., ECF No. 10-2, at ¶ 11.  Later, on May 7, 2021, another contracting officer from the State Department emailed personnel from PAE and informed them that ACCL International was designated: "Do not Consider (not authorized) Any existing projects need to immediately end."  Menard Decl., ECF No. 10-3, at 96.

On May 18, 2021, the State Department's assigned contracting officer for the SaSS Task Order talked formally with a senior contracts manager for PAE about PAE's subcontract with ACCL International on the SaSS Task Order.  *See id.* at ¶¶ 11–12.  During that meeting, the State Department's contracting officer confirmed that ACCL International had failed RAM vetting and agreed that PAE should terminate ACCL's subcontract on the SaSS Task Order.  *See id.* at ¶ 13.  On May 20, 2021, PAE informed ACCL International that it was terminating for convenience ACCL International's subcontract based on "written direction" from the State Department "to terminate immediately all ongoing work with [ACCL International] in support of" the SaSS contract.  Pirzada Decl., ECF No. 4-1, at ¶ 15.  On that same day, "PAE informed ACCL International that it would not be renewing its options to extend [ACCL's] subcontracts [for the O&M Contract] as a result of an instruction from the State Department."  Pirzada Suppl. Decl., ECF No. 12-1, at ¶ 14.

ACCL International "has attempted without success, to obtain information from the State Department about the specific basis on which [it] instructed DynCorp and PAE to cease doing any business with ACCL International."  Pirzada Decl., ECF No. 4-1, at ¶ 16; *see also* Ervin Decl., ECF No. 12-2, at ¶¶ 3–9.  The State Department has informed ACCL nothing more than that "the State Department's vendor vetting office had been informed through classified intelligence channels that there were indications that ACCL International had 'contracted with the enemy.'" Ervin Decl., ECF No. 12-2, at ¶ 6.  ACCL International also discovered that the Department of Defense changed ACCL International's status within its vendor vetting database from "Acceptable" to "Unacceptable without Mitigation."  Pirzada Decl., ECF No. 4-1, at ¶ 16.  ACCL, however, has been unable to obtain "information from the Defense Department regarding the basis for th[is] status change" or "what mitigation measures are necessary."  *Id.*

**D.  ACCL International's Motion for a Preliminary Injunction**

On June 30, 2021, ACCL International filed a civil action against the State Department, accompanied by a motion for a preliminary injunction.  In its motion for a preliminary injunction, ACCL International argues that the State Department effectuated a *de facto* debarment of ACCL International as a federal contractor, without affording it the notice and opportunity to respond allegedly required by the federal acquisition regulations governing debarment procedures.  *See* Pls.' Mot. at 1.  Accordingly, ACCL International asserts that the State Department's *de facto* debarment violated the Administrative Procedure Act ("APA") and was *ultra vires*, *i.e.*, beyond the scope of the State Department's authority.  *See id.*; Compl. at ¶ 33.

Furthermore, ACCL International contends that the State Department's procedurally improper *de facto* debarment will cause the company irreparable harm.  To demonstrate this harm, ACCL International explains that 80% of its annual revenue and 90% of its total gross margin is

attributable to the company's subcontracts with DynCorp and PAE.  *See* Pirzada Suppl. Decl., ECF

No. 12-1, at ¶¶ 3–4.  Accordingly, ACCL states that because of the State Department's *de facto*

debarment and the termination of the PAE and DynCorp subcontracts, the company expects to lose

at least $30 million in the next year, and $120 million over the course of the next four years.  *Id.*

at ¶ 5.  Additionally, ACCL International argues more generally that its purported debarment will

prevent the company from competing for "any" State Department contract, including as a

subcontractor on the upcoming Baghdad Life Support Services ("BLiSS") contract in Iraq, as well

as potential projects in East Africa, Kuwait, and Qatar.  Pirzada Decl., ECF No. 4-1, at ¶ 18.  Lastly,

ACCL International asserts that its *de facto* debarment will negatively impact its ability to pursue

contracts with NATO in Germany.  *Id.* at ¶ 19.  Under these circumstances and absent injunctive

relief to reverse its purported *de facto* debarment, ACCL International anticipates "having to cease

business operations no later than the end of 2021."  *Id.* at ¶ 22.

On July 2, 2021, the Court held an initial status conference to address ACCL International's

newly filed motion for a preliminary injunction.  During that conference, the Court set a briefing

schedule on the motion and specifically advised the government to file the complete administrative

record regarding the State Department's conduct at issue in this case.  *See* Order, ECF No. 8, at ¶

8(d) (citing *Am. Bioscience, Inc. v. Thompson*, 243 F.3d 579, 582 (D.C. Cir. 2001) ("We hold only

that the court, before assessing American Bioscience's probability of success on the merits, should

have required the FDA to file the administrative record and should have determined the grounds

on which the FDA granted Baker Norton's application."), and LCvR 7(n)).  The parties have now

completed their briefing and the State Department has filed the relevant administrative record on

the docket.  Accordingly, ACCL International's motion for a preliminary injunction is now ripe

for this Court's review.

## II.   LEGAL STANDARD

Preliminary injunctive relief is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Sherley v. Sebelius*, 644 F.3d 388, 392 (D.C. Cir. 2011) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008)); *see also Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (per curiam) ("[A] preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion.") (internal quotation marks omitted).

Plaintiffs seeking preliminary injunctive relief "must establish (1) that [they are] likely to succeed on the merits, (2) that [they are] likely to suffer irreparable harm in the absence of preliminary relief, (3) that the balance of equities tips in [their] favor, and (4) that an injunction is in the public interest." *Aamer v. Obama*, 742 F.3d 1023, 1038 (D.C. Cir. 2014) (quoting *Sherley*, 644 F.3d at 392) (internal quotation marks omitted). When seeking such relief, "the movant has the burden to show that all four factors, taken together, weigh in favor of the injunction." *Abdullah v. Obama*, 753 F.3d 193, 197 (D.C. Cir. 2014) (quoting *Davis v. Pension Benefit Guar. Corp.*, 571 F.3d 1288, 1292 (D.C. Cir. 2009)) (internal quotation marks omitted).

In this jurisdiction, "[t]he four factors have typically been evaluated on a sliding scale": if the "movant makes an unusually strong showing on one of the factors, then it does not necessarily have to make as strong a showing on another factor." *Davis*, 571 F.3d at 1291–92 (internal quotation and citation omitted). It is unclear whether the sliding-scale approach to assessing the four preliminary injunction factors survives the Supreme Court's decision in *Winter*. *See Save Jobs USA v. U.S. Dep't of Homeland Sec.*, 105 F. Supp. 3d 108, 112 (D.D.C. 2015). Several judges on the D.C. Circuit have "read *Winter* at least to suggest if not to hold 'that a likelihood of success is an independent, free-standing requirement for a preliminary injunction.'" *Sherley*, 644 F.3d at

393 (internal citation omitted).  However, the D.C. Circuit has yet to hold definitively that *Winter* has displaced the sliding-scale analysis.  *See id.*; *see also Save Jobs USA*, 105 F. Supp. 3d at 112. In light of this ambiguity, the Court shall consider each of the preliminary injunction factors and shall only evaluate the proper weight to accord the likelihood of success on the merits if the Court finds that its relative weight would affect the outcome.

### III.    DISCUSSION

For the reasons set forth below, the Court concludes that ACCL International has not shown a substantial likelihood of success on the merits, a certainty of irreparable harm, or that the balance of the equities and the public interest tilts in its favor.  Accordingly, the Court will **DENY** ACCL International's motion for a preliminary injunction.

### A.  Likelihood of Success on the Merits

First, "[i]n order to obtain a preliminary injunction, a party must show, among other things, 'a substantial likelihood of success on the merits.'"  *Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 913 (D.C. Cir. 2015) (quoting *Mills v. District of Columbia*, 571 F.3d 1304, 1308 (D.C. Cir. 2009)).  The D.C. Circuit has identified a "likelihood of success on the merits" as the "most important factor" for courts to consider when reviewing a motion for a preliminary injunction. *Aamer v. Obama*, 742 F.3d 1023, 1038 (D.C. Cir. 2014).

In this case, ACCL International's chance of success on the merits rests on the company's claim that the State Department improperly caused its *de facto* debarment from federal contracting. *See* Pls.' Mot. at 7.  As discussed in detail below, a *de facto* debarment "occurs when a contractor has, for all practical purposes, been suspended or blacklisted from working with a government agency."  *Phillips v. Mabus*, 894 F. Supp. 2d 71, 81 (D.D.C. 2012).  Here, ACCL International argues that the State Department caused its *de facto* debarment, and did so without providing the

company notice or an opportunity to respond, as required by the both the Federal Acquisition Regulation ("FAR") and the Department of State Acquisition Regulations ("DOSAR").  *See* 48 C.F.R. § 9.406-3 (directing federal agencies to provide notice and opportunity to respond to official debarment); 48 C.F.R. § 609.406-3 (providing debarment procedures for the State Department). ACCL International contends, therefore, that this procedurally improper debarment violated the APA, because it constituted an "agency action" "in excess of" the State Department's statutory "authority" or "limitations."  5 U.S.C. § 706(2)(C).  Alternatively, ACCL International argues that the State Department's procedurally deficient debarment was *ultra vires*.  *See* Pls.' Mot. at 7.

### 1. Subject Matter Jurisdiction

The first hurdle ACCL International's *de facto* debarment claim faces is jurisdictional.  The State Department argues that ACCL International's claim is nothing more than a contractual dispute over the terms of ACCL's subcontracts with DynCorp and PAE, and that the Court lacks subject matter jurisdiction over such breach of contract claims.  *See* Def.'s Opp'n at 11–12.  As a general matter, the State Department is correct to raise subject matter jurisdiction as a potential barrier to ACCL's request for injunctive relief, given that "the 'merits' on which [a] plaintiff must show a likelihood of success encompass not only substantive theories but also establishment of jurisdiction."  *Food & Water Watch, Inc.*, 808 F.3d at 913.  Furthermore, this Court has "an independent obligation to determine whether subject matter jurisdiction exists, even when no party challenges it."  *Hertz Corp. v. Friend*, 559 U.S. 77, 94 (2010).

The State Department's jurisdictional argument turns on its attempt to frame ACCL's claim as purely contractual.  In the State Department's view, ACCL International's claim "arises from [the company's] subcontracts under certain prime contracts with the Department and challenges actions taken by the Department and the prime contractors under those contracts and subcontracts."

Def.'s Opp'n at 11.   Accordingly, the State Department asserts that "the present lawsuit is a contract action disguised as an administrative action."   *Id.*   To support this position, the State Department relies on the reasoning of *Ingersoll-Rand Co. v. United States*, 780 F.2d 74 (D.C. Cir. 1985), which instructs that "[t]he classification of a particular action as one which is or is not 'at its essence' a contract action depends both on the source of the rights upon which the plaintiff bases its claim, and upon the type of relief sought (or appropriate)."   *Id.* (quoting *Megapulse, Inc. v. Lewis*, 672 F.2d 959, 968 (D.C. Cir. 1982)).   In *Ingersoll-Rand*, for example, the plaintiff's nominal statutory claim ultimately sounded in contract, because "it [wa]s possible to conceive of [the plaintiff's] dispute as entirely contained within the terms of the contract" at issue.   *Ingersoll-Rand Co.*, 780 F.2d at 78.   Here, the State Department similarly contends that "the only actions at issue are those that arise from ACCL's subcontracts [with DynCorp and PAE] and the contracting process," matters over which this Court lacks jurisdiction.   Def.'s Reply at 5.

The Court is unpersuaded by this argument.   Unlike in *Ingersoll-Rand*, ACCL International expressly asserts a *de facto* debarment claim, a cause of action which is necessarily broader than a specific contractual right.   ACCL's claim is not confined to any single contract, but instead asserts that the State Department has violated its due process rights by functionally blacklisting the company from all future government contracting.   *See* Pls.' Mot. at 6–7; *see also Phillips v. Mabus*, 894 F. Supp. 2d 71, 81 (D.D.C. 2012) ("*De facto* debarment occurs when a contractor has, for all practical purposes, been suspended or blacklisted from working with a government agency without due process, namely, adequate notice and a meaningful hearing.").   While disputes over specific ACCL subcontracts may be "embedded" within this *de facto* debarment claim, it does not sound in breach of contract.   *See*, *e.g.*, *Com. Drapery Contractors, Inc. v. United States*, 133 F.3d 1, 4 (D.C. Cir. 1998) ("The basis of Commercial's and Milford's claim is that GSA's repeated attempts

to extricate the government from financial dealings with them constituted unlawful 'blacklisting.' The dispute over the termination clause in their contracts is embedded within this broader claim, and is not an independent cause of action. . . . The claim and the type of relief requested thus reveal that this is not 'at its essence' a contract action."). Accordingly, the Court rejects the State Department's attempt to frame ACCL International's *de facto* debarment claim as a contractual matter over which the Court lacks jurisdiction.

Quite to the contrary, the Court finds that it affirmatively possesses subject matter jurisdiction over ACCL International's *de facto* debarment claim. First, ACCL International presents its *de facto* debarment claim as a cause of action under either the APA, asserting that the State Department's debarment constituted an "agency action" "in excess of" the State Department's statutory "authority" or "limitations," 5 U.S.C. § 706(2)(C); *see also* Pls.' Mot. at 7, or, alternatively, as an *ultra vires* claim. While these claims may well be flawed on the merits, they are still federal claims over which the Court has federal question jurisdiction. *See* 28 U.S.C. § 1331; *SRS Techs. v. United States*, 843 F. Supp. 740, 742 (D.D.C. 1994) ("Plaintiff is seeking judicial review of agency actions allegedly in violation of agency regulations, the classic case for APA jurisdiction."); *Dart v. United States*, 848 F.2d 217, 224 (D.C. Cir. 1988) ("When an executive acts *ultra vires*, courts are normally available to reestablish the limits on his authority."). Furthermore, as addressed in detail below, claims of *de facto* debarment ultimately derive from a plaintiff's constitutional due process rights, a matter over which this Court unquestionably possesses jurisdiction. *See* disc. *infra* at 25–30; 28 U.S.C. § 1331. For these reasons, the Court finds that it possesses subject matter jurisdiction over ACCL International's *de facto* debarment claim.

### 2.   Success on the Merits

Having determined that jurisdiction exists, the Court now proceeds to the substance of ACCL International's claim for relief.   ACCL International's claim is succinct: The State Department effectuated a *de facto* debarment of ACCL International, but failed to give the company notice and an opportunity to respond to the debarment, as required by the federal regulations governing debarment proceedings.   *See, e.g.*, Pls.' Mot. at 6–7; Pls.' Reply at 2–3. According to ACCL International, the State Department's procedural non-compliance rendered its *de facto* debarment "unlawful—whether viewed under the . . . APA or as *ultra vires*."   Pls.' Reply at 3.

ACCL International's *de facto* debarment claim relies on two essential predicates: (1) that the State Department actually effectuated a *de facto* debarment of ACCL, and (2) that the State Department's *de facto* debarment was unlawful because it did not comply with the procedures required by the federal debarment regulations.   As explained below, ACCL International has failed to establish a substantial likelihood that either predicate is correct.   This shortcoming prevents ACCL International from establishing a "substantial likelihood of success on the merits." *Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 913 (D.C. Cir. 2015).

#### a.   De Facto Debarment

The first predicate to ACCL International's *de facto* debarment claim is that the company was actually *de facto* debarred by the State Department.   The existence of a *de facto* debarment by the State Department is central to ACCL International's claim for relief and, therefore, critical to its chance of success on the merits.   On the present record, the case for a *de facto* debarment presents a close question.   But for the purposes of a preliminary injunction, the Court finds that

ACCL International has not established with sufficient certainty that the State Department did, in fact, cause ACCL's *de facto* debarment.

"*De facto* debarment occurs when a contractor has, for all practical purposes, been suspended or blacklisted from working with a government agency without due process, namely, adequate notice and a meaningful hearing." *Phillips v. Mabus*, 894 F. Supp. 2d 71, 81 (D.D.C. 2012) (citing *Trifax Corp. v. Dist. of Columbia*, 314 F.3d 641, 643–44 (D.C. Cir. 2003); *TLT Constr. Corp. v. United States*, 50 Fed. Cl. 212, 215 (2001)). "The standard for proving *de facto* debarment is high." *Phillips v. Spencer*, 390 F. Supp. 3d 136, 155 (D.D.C. 2019). "'Two options exist to establish a *de facto* debarment claim: 1) by an agency's statement that it will not award the contractor future contracts; or 2) by an agency's conduct demonstrating that it will not award the contractor future contracts.'" *Mabus*, 894 F. Supp. 2d at 81 (quoting *TLT Constr.*, 50 Fed. Cl. at 215–16). Ultimately, "[t]o demonstrate *de facto* debarment, plaintiffs must show 'a systematic effort by the procuring agency to reject all of the bidder's contract bids.'" *Id.*

In this case, ACCL International's *de facto* debarment claim rests on the specific actions taken by the State Department regarding ACCL's subcontracts in Afghanistan with DynCorp and PAE. To begin, the record clearly reflects that the State Department took action because of classified, derogatory vetting information on ACCL International uncovered by the State Department's RAM office. *See* Farrell Decl., ECF No. 10-1, at ¶¶ 7, 9. The RAM office uncovered this derogatory information some "years ago," but the State Department's SCA Bureau, which is responsible for the diplomatic platform of the United States in Afghanistan, first learned of the information in February 2021. *See* Merrill Decl., ECF No. 10-4, at ¶¶ 2–3. After receiving and considering this derogatory information, the SCA Bureau ultimately determined in April 2021 that

"ACCL should not be used as a subcontractor to provide services at Embassy Kabul under the ALiSS contract." *Id.* at ¶ 5.

To show a *de facto* debarment, ACCL International points to the SCA Bureau's decision and its direct impact on ACCL's subcontracts with both DynCorp and PAE. First, the SCA Bureau notified Mr. John Stever, the State Department's Director of Worldwide Contracts, that ACCL "should not be used as a subcontractor on DynCorp's [ALiSS] contract in Afghanistan, in light of certain derogatory information discovered." Stever Decl., ECF No. 10-5, at ¶ 10. This caused Mr. Stever to inform Mr. Robert Caldwell, the Vice President of Contracts for DynCorp, that "DynCorp would need to sever its relationship with ACCL with regard to the ALiSS contract, and find a replacement subcontractor." *Id.* at ¶ 11. Mr. Stever and Mr. Caldwell later agreed that DynCorp would maintain ACCL as a subcontractor until August 2021, but would then decline to renew ACCL's subcontract on the ALiSS contract. *Id.* at ¶ 12. ACCL International now confirms that, in accordance with the State Department's directive, DynCorp has not offered ACCL an opportunity to submit a renewal bid as a subcontractor for the renewed ALiSS contract, set to begin on August 20, 2021. *See* Pirzada Suppl. Decl., ECF No. 12-1, at ¶ 9.

The State Department also took steps to limit ACCL's subcontracts in Afghanistan with PAE. In April 2021, Mr. Stever telephoned an executive from PAE and informed him that the State Department had uncovered derogatory information on ACCL. *See* Stever Decl., ECF No. 10-5, at ¶ 15. Thereafter, a contracting officer representative from the State Department contacted PAE and directed the company not to exercise ACCL's next option year for its subcontracts for painting services at the Kabul embassy, under the O&M Contract. Jackson Decl., ECF No. 10-2, at ¶¶ 9–11. On May 7, 2021, a contracting officer from the State Department informed PAE personnel that ACCL International had been designated: "Do not Consider (not authorized) Any

existing projects need to immediately end."  Menard Decl., ECF No. 10-3, at 96.  Finally, on May

18, 2021, another State Department contracting officer met with PAE to confirm that ACCL

International had failed RAM vetting and that PAE should terminate ACCL's subcontract on the

SaSS Task Order.  *See id.* at ¶¶ 11–13.  On May 20, 2021, PAE informed ACCL International that

it was terminating for convenience ACCL's SaSS subcontract based on "written direction" from

the State Department "to terminate immediately all ongoing work with [ACCL International] in

support of" the SaSS contract.  Pirzada Decl., ECF No. 4-1, at ¶ 15.  On that same day, "PAE

informed ACCL International that it would not be renewing its options to extend [ACCL's]

subcontracts [for the O&M Contract] as a result of an instruction from the State Department."

Pirzada Suppl. Decl., ECF No. 12-1, at ¶ 14.

ACCL International argues that this record demonstrates a "systematic" effort by the State

Department to debar ACCL as a federal contractor.  *See* Pls.' Mot. at 7; Pls.' Reply at 14–15.  In

particular, ACCL emphasizes that the record, as outlined above, reflects efforts by the State

Department (1) to prevent ACCL from renewing its ALiSS subcontract with DynCorp, (2) to

prevent ACCL from renewing its O&M subcontracts with PAE, and (3) to cause the termination

of ACCL's SaSS subcontract with PAE.  *See* Pls.' Reply at 14.  According to ACCL, these adverse

developments with multiple of the company's Afghanistan subcontracts had a comprehensive

effect on ACCL's contracting business, particularly because the company "performs all of its work

in Afghanistan and the vast majority in support of the U.S. government there."  Pls.' Reply at 15;

*see also* Pirzada Suppl. Decl., ECF No. 12-1, at ¶ 3 ("ACCL International conducts 100% of its

business in Afghanistan.").  As further evidence of its purported debarment, ACCL International

notes that the State Department alerted U.S. Central Command of the derogatory information it

uncovered on ACCL International, *see* Farrell Decl., ECF No. 10-1, at ¶ 9, and that the Defense

Department elected to change ACCL's vendor status within its vendor database from "Acceptable" to "Unacceptable without Mitigation," Pirzada Decl., ECF No. 4-1, at ¶ 15.  Altogether, ACCL International contends that the State Department's actions have caused it to lose "100% of [its] current and future State Department work," thereby presenting "a clear-cut case of *de facto* debarment."  Pls.' Reply at 15.

Unfortunately for ACCL International, the case for *de facto* debarment on the present record is not as "clear-cut" as it suggests.  To start, the Court is unpersuaded by ACCL International's reliance on the Defense Department's decision to downgrade ACCL's status within its internal vendor database.  To establish a *de facto* debarment, a plaintiff must point to some statement or conduct by the agency in the case, indicating that the agency has comprehensively precluded the plaintiff from participating in that agency's contracts.  *See Phillips v. Mabus*, 894 F. Supp. 2d 71, 81 (D.D.C. 2012) (quoting *TLT Constr.*, 50 Fed. Cl. at 215–16).  As such, the distinct conduct of the Defense Department (not even a party to this action) does not support ACCL International's assertion that the *State Department* effectuated a *de facto* debarment against it. Moreover, the State Department specifically refutes the claim that it shared the content of the derogatory material on ACCL International with the Defense Department, or that it directed the Defense Department to downgrade ACCL International's vendor status.  *See* Farrell Decl., ECF No. 10-1, at ¶ 9.  For these reasons, the Court does not find that the Defense Department's decision to downgrade ACCL International's vendor status establishes that the State Department has effectuated a *de facto* debarment against ACCL.

At bottom, the gravamen of ACCL International's case for *de facto* debarment turns on the State Department's treatment of ACCL as a subcontractor to DynCorp and PAE in Afghanistan. The State Department does not refute that it informed both DynCorp and PAE that derogatory

vetting information on ACCL International had surfaced.  *See, e.g.*, Stever Decl., ECF No. 10-5,
at ¶¶ 10–15.  The record also demonstrates that because of this derogatory information, the State
Department directed PAE to terminate its subcontract with ACCL on the SaSS Task Order, *see*
Menard Decl., ECF No. 10-3, at ¶ 13, and not to renew its subcontracts with ACCL on the O&M
Contract, *see* Jackson Decl., ECF No. 10-2, at ¶11.  Similarly, the record shows that the State
Department directed DynCorp not to renew ACCL's subcontract for the ALiSS contract.  *See*
Stever Decl., ECF No. 10-5, at ¶ 12.  At first blush, these adverse contract actions, including the
State Department instructions not to renew multiple future subcontracts with ACCL, present a
colorable basis for a *de facto* debarment claim.  But to receive a preliminary injunction, ACCL
must show a *substantial likelihood of success on the merits*, and the unique facts surrounding
ACCL's subcontracts with PAE and DynCorp cast doubt on ACCL's claim that a *de facto*
debarment actually occurred.

To reiterate, the key feature of *de facto* debarment is a "*systematic* effort by the procuring
agency to reject *all* of the bidder's contract bids."  *TLT Const. Corp. v. United States*, 50 Fed. Cl.
212, 215 (2001) (emphasis added).  Put otherwise, "*de facto* debarment occurs when a contractor
or a subcontractor has, for all practical purposes, been suspended or blacklisted from working with
a government agency."  *Phillips v. Spencer*, 390 F. Supp. 3d 136, 155 (D.D.C. 2019).  A critical
distinction must be drawn, therefore, between government conduct that comprehensively
precludes a company from all government work based on a holistic assessment of the company's
status as a federal contractor and, conversely, government conduct that merely targets discrete
contractual matters.  *See, e.g.*, *Old Dominion Dairy Prod., Inc. v. Sec'y of Def.*, 631 F.2d 953, 964
(D.C. Cir. 1980) ("[I]t cannot be disputed that the Government action in this case effectively

foreclosed Old Dominion's freedom to take advantage of other Government employment opportunities, and barred ODDPI *from all public employment*.") (emphasis added).

In this case, there is material in the present record to suggest that the State Department's conduct was specific to ACCL International's subcontracts with DynCorp and PAE, and was not targeted at ACCL's overall ability to contract with the federal government.  First, while the State Department's conduct impacted multiple ACCL subcontracts, each of the affected subcontracts pertained to a specific type of work: *support services performed at diplomatic facilities in Kabul, Afghanistan*.  Under the ALiSS contract with DynCorp, ACCL International provides food services for the United States Embassy in Kabul.  *See* Merrill Decl., ECF No. 10-4, at ¶ 3.  Under the O&M Contract with PAE, ACCL International carried out painting work on the exterior of the U.S. Embassy in Kabul, including the Marine Security Guard Quarters and Arian Buildings in the U.S. Embassy Compound.  Jackson Decl., ECF No. 10-2, at ¶ 6.  And finally, under the SaSS Task Order with PAE, ACCL International provided "facility, operations, maintenance, and life support services" for the State Department's Criminal Justice Task Force and its Counter Narcotics Justice Center, Sensitive Investigative Unit, and National Interdiction Unit compounds in Kabul, Afghanistan.  Pirzada Decl., ECF No. 4-1, at ¶ 14.

The overlapping focus of ACCL International's affected subcontracts with DynCorp and PAE reveals a common denominator.  Each subcontract involved ACCL's work at a State Department facility in Kabul, Afghanistan, including the United States Embassy itself.  This fact is significant for the Court's *de facto* debarment analysis because it plausibly limits the scope of the State Department's actions to a narrow set of similar contracts in Kabul, rather than to ACCL International's overall status as a contractor with the State Department.  Reinforcing this conclusion is record evidence showing that the State Department only took steps to address ACCL

International's subcontracts in Afghanistan after the SCA Bureau received Top Secret derogatory counterterrorism material indicating that ACCL had "contracted with the enemy." Ervin Decl., ECF No. 12-2, at ¶ 6. Such information presents obvious security concerns that are *uniquely linked* to ACCL International's specific contracts for work on diplomatic facilities in Kabul, Afghanistan, the epicenter of an active war zone presently enveloped in a complex withdrawal of U.S. troops. *See* ACCL-UC at 715 (email from State Department personnel noting "security threats related to the . . . military withdrawal").

Next, the record demonstrates that the State Department's *decision-making process* surrounding ACCL International's subcontracts was also tailored to the unique conditions in Kabul. The State Department took action against ACCL International because of "derogatory" information uncovered on the company through a counterterrorism namecheck vetting program run by the Department's RAM office. *See* Farrell Decl., ECF No. 10-1, at ¶ 7. But importantly, the effect of this "derogatory" vetting information was neither absolute nor comprehensive. Instead, it was up to the State Department's SCA Bureau, which is specifically responsible for diplomatic affairs in Afghanistan, to make its own assessment of the derogatory information on ACCL, in light of the risk factors applicable in Kabul at the time. *See* Farrell Decl., ECF No. 10-1, at ¶ 5. If the contracts at issue were, instead, based in a different region or country, then the State Department bureau responsible for that area would have to make a distinctive assessment of the derogatory information on ACCL International, based on "the particular risks and other factors associated with the programs and activities" in question. *Id.* Furthermore, counterterrorism namecheck vetting is not even applicable to all countries or State Department programs. *See id.* at ¶ 4. In short, the effect of derogatory vetting information, like the information uncovered on ACCL International, *is not* consistent across all State Department contracts or programs.

Taken together, this record material suggests that the State Department's conduct towards ACCL's subcontracts with DynCorp and PAE was uniquely linked to classified counterterrorism intelligence implicating the security of diplomatic facilities in Kabul, Afghanistan, at a time of considerable tumult in that country.   And the State Department's assessment of ACCL's subcontracts in this salient context was not agency-wide, but rather was made by the State Department bureau specifically responsible for diplomatic affairs in Afghanistan.  Indeed, the State Department did not place ACCL International on any agency-wide "blacklist" for all State Department business, *see* Stever Decl., ECF No. 10-5, at ¶¶ 19–20, but instead precluded ACCL from specific contracts for work on diplomatic facilities in Kabul during a time of war.  It does not clearly follow from these distinctive circumstances that the State Department set in motion "'a systematic effort . . . to reject all of [ACCL International's] contract bids.'"  *Mabus*, 894 F. Supp. 2d at 81 (quoting *TLT Constr.*, 50 Fed. Cl. at 215).

For example, while ACCL International asserts that its current contracting work occurs entirely in Afghanistan, it also states that it is preparing to compete for a State Department contract in *Iraq*.  *See* Pirzada Decl., ECF No. 4-1, at ¶ 18.  ACCL International also complains that the State Department's *de facto* debarment has "foreclose[d] potential work on projects in *East Africa*, *Kuwait*, and *Qatar* where the United States government has a presence."  Pls.' Mot. at 9 (emphasis added).  Finally, ACCL International states that it "has licenses in *Germany* for NATO contracts." Pirzada Decl., ECF No. 4-1, at ¶ 19 (emphasis added).  Collectively, this record evidence reveals ACCL International's capacity and desire to compete for State Department contracts *outside* of Afghanistan, and it is not clear on the present record that ACCL International would be categorically excluded from such contracting opportunities.  As explained above, the contract actions taken against ACCL International in Afghanistan specifically involved work on diplomatic

facilities in Kabul, amidst highly unique and country-specific conditions. The Court cannot confidently conclude, therefore, that the State Department's actions targeted ACCL International's "overall status . . . as a contractor" writ large. *Phillips v. Mabus*, 894 F. Supp. 2d 71, 82 (D.D.C. 2012).

Given this ambiguity, the Court is unable to find, for the purposes of a preliminary injunction, a *substantial likelihood* that ACCL International has met what is already a "high . . . standard for proving *de facto* debarment." *Phillips v. Spencer*, 390 F. Supp. 3d 136, 155 (D.D.C. 2019); *see also IFONE NEDA Internet Serv., Inc. v. Army & Air Force Exch. Serv.*, No. 4:21-CV-330, 2021 WL 1148345, at *5 (S.D. Tex. Mar. 25, 2021) (concluding that movant had not established a "substantial likelihood of proving a *de facto* debarment claim."). And, as noted above, ACCL International's claim that the State Department denied it adequate process, *i.e.*, notice and an opportunity to respond, relies entirely on the assertion that a *de facto* debarment actually occurred. *See* Pls.' Mot. at 7. Absent a viable demonstration of a *de facto* debarment, therefore, ACCL International's ability to show a substantial likelihood of success on the merits quickly breaks down. *Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 913 (D.C. Cir. 2015).

### b. Constitutional Due Process

Even if ACCL International had established that the State Department caused its *de facto* debarment, the success of ACCL's claim also relies on a second predicate. Specifically, ACCL International claims that the State Department's *de facto* debarment was unlawful because it failed to follow the notice procedures required by federal debarment regulations. *See* Pls.' Mot. at 6–7; Pls.' Reply at 2–3. But as explained below, the Court disagrees with this premise in one critical respect. ACCL International's *de facto* debarment claim does not derive from *federal debarment regulations*, but rather from *constitutional due process*. And the scope of ACCL International's

due process rights presents yet another impediment to the preliminary injunction the company has requested.

ACCL International's claim assumes that when the State Department causes a *de facto* debarment, it must follow the notice procedures set forth in the applicable federal procurement regulations, *i.e.*, the Federal Acquisition Regulation ("FAR") and the Department of State Acquisition Regulations ("DOSAR").  *See* Pls.' Mot. at 6–7; Pls.' Reply at 17–20; 48 C.F.R. § 9.406-3(c); 48 C.F.R. § 609.406-3.  According to ACCL, when the State Department causes a *de facto* debarment without following the notice procedures required by the FAR and the DOSAR, the agency has acted unlawfully.  *See* Pls.' Mot. at 6–7; Pls.' Reply at 17–20.  But the Court is not convinced that this foundational assumption is correct.  The notice procedures codified in the FAR and the DOSAR apply where the State Department has taken *formal* steps towards debarment.  For example, the State Department's regulations specifically provide that "upon receipt of a complete referral [for consideration of debarment] and after consulting with the Office of the Legal Adviser, the debarring official shall decide whether to initiate a debarment action."  48 C.F.R. § 609.406-3(c)(1).  Then, "*when a determination is made to initiate action*, the debarring official shall provide to the contractor and any specifically named affiliates written notice."  *Id.* at § 609.406-3(c)(2) (emphasis added).  Similarly, the FAR calls for notice procedures specifically where there has been a "proposed debarment," 48 C.F.R. § 9.406-3(c), or a formal decision to "impose debarment," *id.* at § 9.406-3(e).

But in this case, ACCL International does not contend that the State Department initiated any formal debarment proceedings against it.  *See, e.g.*, Stever Decl., ECF No. 10-5, at ¶ 19 ("As far as I am aware, DOS has not debarred ACCL or taken any actions to do so.").  The absence of any formal debarment action by the State Department distinguishes ACCL International's present

claim from those cases where the federal debarment regulations clearly apply.  For example, ACCL International relies heavily on *Friedler v. GSA*, 271 F. Supp. 3d 40 (D.D.C. 2017), to demonstrate that agencies carrying out debarment actions must comply with the attendant notice requirements set forth in the Federal Acquisition Regulation.  Critically, however, *Friedler* involved a formal debarment action, which explicitly triggered the applicable notice requirements provided by the FAR.  *Id.* at 50 ("[O]n September 4, 2015, Swaby issued a Final Debarment Notice to Friedler, which debarred him until May 20, 2019.").  In similar cases, courts in this jurisdiction have required compliance with the FAR, where agencies effectuate a *formal* debarment.  *See, e.g.*, *Caiola v. Carroll*, 851 F.2d 395, 397–99 (D.C. Cir. 1988); *Burke v. EPA*, 127 F. Supp. 2d 235, 239–40 (D.D.C. 2001).  But here there has been no such formal debarment proceeding.  It is not clear, therefore, that the State Department is bound by the attendant federal debarment regulations, as ACCL International now argues.

Instead, ACCL International's *de facto* debarment claim against the federal government implicates an entirely separate source of rights: the due process liberty interest under the Fifth Amendment.  While the parties in this case appear to disregard this point, both binding and persuasive authority on *de facto* debarment claims reinforce the conclusion.  To begin, the Court looks to the D.C. Circuit's jurisprudence on *de facto* debarment.  In the seminal case *Old Dominion Dairy Products, Inc. v. Secretary of Defense*, a company named Old Dominion was denied two federal contracts because of a determination by the government that Old Dominion "lacked integrity."  631 F.2d 953, 955 (D.C. Cir. 1980).  This non-responsibility designation "effectively foreclosed Old Dominion's freedom to take advantage of other Government employment opportunities, and barred [Old Dominion] from all public employment."  *Id.* at 964.  Put otherwise, Old Dominion was *de facto* debarred.  On these facts, the D.C Circuit found that the government's

*de facto* debarment of Old Dominion called into question the company's "good name and integrity" and, therefore, implicated Old Dominion's "due process liberty right" under the Fifth Amendment to be free from a government-imposed stigma that foreclosed future employment opportunities. *Id.*; *see also Board of Regents v. Roth*, 408 U.S. 564, 573 (1972). Accordingly, it was Old Dominion's due process liberty interest, rather than any federal regulation, that entitled the company to notice of the charges against it and an opportunity to respond to its *de facto* debarment. *Old Dominion*, 631 F.2d at 969.

The D.C. Circuit's analysis in *Kartseva v. Dep't of State*, 37 F.3d 1524 (D.C. Cir. 1994), is also instructive. In *Kartseva*, a Russian translator was fired by her private employer after the State Department declared her ineligible to work on certain State Department contracts due to "several significant counterintelligence concerns." *Id.* at 1525. As in *Old Dominion*, the D.C. Circuit reasoned that if Ms. Kartseva's derogatory designation by the State Department had the effect of broadly excluding her from future government employment opportunities, then her due process "liberty interest" would be implicated. *Id.* at 1528. Specifically, the D.C. Circuit explained that while a *formal* debarment would entitle Ms. Kartseva to the "procedural safeguards mandated by regulation," a *de facto* debarment affecting her "eligibility to work on future State Department contracts" would provide her with "*a cause of action for violation of her due process liberty interest*." *Id.* (emphasis added).

The reasoning set forth in *Old Dominion* and *Kartseva* is essential. These two cases demonstrate that *de facto* debarment claims do not rest on alleged violations of federal debarment regulations, but rather on constitutional due process rights. And subsequent *de facto* debarment cases in this jurisdiction have followed precisely this legal framework. *See Phillips v. Spencer*, 390 F. Supp. 3d 136, 156 (D.D.C. 2019) ("The undisputed facts do not demonstrate that Plaintiffs

have been *de facto* debarred on a systematic basis from government contracting work in violation

of the Due Process Clause of the Fifth Amendment . . . "); *Bannum, Inc. v. Samuels*, 221 F. Supp.

3d 74, 86 (D.D.C. 2016) ("The D.C. Circuit has acknowledged that there are circumstances when

the government could effectively bar a contractor from receiving government business without

invoking formal debarment proceedings, and it has held that *de facto* debarment, 'government

stigmatization that broadly precludes individuals or corporations from a chosen trade or business[,]

. . . deprives them of liberty in violation of the Due Process Clause.'") (quoting *Trifax Corp. v.

District of Columbia*, 314 F.3d 641, 644 (D.C. Cir. 2003)).

Curiously, and despite direct prompting from this Court, neither party accepts this

foundational premise.[2]  Yet, the parties' respective motion papers ultimately belie their own

positions.  For example, ACCL International argues that "the State Department's *de facto*

debarment amounts to *a due process violation*, and the violation of *a constitutional right* such as

this is per se irreparable."  Pls.' Reply at 21 (citation omitted and emphasis added).  Furthermore,

it is quite telling that the *de facto* debarment cases cited in the parties' own briefs explicitly

consider the claim of *de facto* debarment as one grounded in constitutional due process.  *See, e.g.*,

*Phillips*, 894 F. Supp. 2d at 82 (considering claim of "*de facto* debarment in violation of the due

process clause of the Fifth Amendment"); *IFONE NEDA Internet Serv., Inc. v. Army & Air Force*

*Exch. Serv.*, Civ. A. No. 21-330, 2021 WL 1148345, *6 (S.D. Tex. Mar. 25, 2021) (explaining that

"*de facto* debarment implicates constitutionally protected liberty interests"); *Highview Eng'g, Inc.*

---

[2] On July 23, 2021, the Court issued a minute order expressly asking the parties for supplemental briefing addressing "[w]hether Plaintiffs' *de facto* debarment claim is grounded in constitutional due process?"  The State Department responded that it "does not understand Plaintiffs' claims in the instant action to be grounded in constitutional due process."  Def.'s Reply at 17.  The Department's position is "based on the evident failure of the Complaint to plead a constitutional due process basis for the claims and of the Motion for Preliminary Injunction to rely on this ground."  *Id.*  In turn, ACCL International elected not to file any supplemental briefing on the due process issue at all.

*v. U.S. Army Corps of Eng'rs*, 864 F. Supp. 2d 645, 653 (W.D. Ky. 2012) (addressing a *de facto* debarment claim and noting that "the Corps is not permitted to debar a person or entity from competing to win government contracts without affording the process due under the Fifth Amendment").  In accordance with this precedent, the Court finds that ACCL International's *de facto* debarment claim rests on the company's Fifth Amendment due process rights.

The conclusion that ACCL International's *de facto* debarment claim is grounded in constitutional due process carries significance in this case for two principal reasons.  First, ACCL International faces a unique challenge in establishing that it has any constitutionally protected due process rights at all.  The present record reflects that ACCL International comprises two corporate entities, Afghan Yar Construction and Afghan Yar Logistics, which are both "incorporated under the laws of Afghanistan [and] headquartered in Kabul, Afghanistan."  Pirzada Decl., ECF No. 4-1, at ¶ 4.  Outside of Afghanistan, ACCL International also maintains "offices in Germany, Iraq, and the United Arab Emirates."  *Id.*  And importantly, ACCL International has not made a clear attempt to demonstrate some form of "substantial connection" through which the company might have otherwise "come within" or developed a "presence" in the United States.  *32 Cty. Sovereignty Comm. v. Dep't of State*, 292 F.3d 797, 799 (D.C. Cir. 2002) (quoting *Nat'l Council of Resistance of Iran v. Dep't of State*, 251 F.3d 192, 202 (D.C. Cir. 2001)).

These facts are significant because "[a] foreign entity without property or presence in this country has no constitutional rights, under the due process clause or otherwise," *People's Mojahedin Org. of Iran v. U.S. Dep't of State*, 182 F.3d 17, 22 (D.C. Cir. 1999), and the D.C. Circuit "has consistently refused to extend extraterritorial application of the Due Process Clause," *Al Hela v. Trump*, 972 F.3d 120, 139 (D.C. Cir. 2020).  To this point, the State Department explicitly argues that "Plaintiffs [are] nonresident aliens without connections to the United States"

and, therefore, "do not possess due process rights."  Def.'s Reply at 17.  ACCL International, however, has remained silent on this issue throughout its preliminary injunction briefing, even after the Court specifically requested briefing on the question of "what due process rights [ACCL International] possesses as [a] foreign entit[y]."  *See* July 23, 2021 Min. Order.  As such, it is unclear at this early stage of the proceedings whether ACCL International can even establish a constitutional due process right to support its *de facto* debarment claim.

Second, even if ACCL International established a constitutional right to due process, the scope of that right is not immediately apparent, given the distinctive facts of this case.  ACCL International argues that it should have been afforded notice of its *de facto* debarment and an opportunity to respond to the reasoning behind the State Department's debarment decision.  *See* Pls.' Mot. at 7.  While such procedural safeguards are generally not uncommon, the concept of due process remains "flexible and calls for such procedural protections as the particular situation demands."  *Morrissey v. Brewer*, 408 U.S. 471, 48 (1972); *see also Mathews v. Eldridge*, 424 U.S. 319, 334–35 (1976).  It is especially relevant, here, that the amount of due process afforded must account for the government's compelling interest in preserving national security.  *See Gonzalez v. Freeman*, 334 F.2d 570, 580 n.21 (D.C. Cir. 1964)); *Kouadio v. Decker*, 352 F. Supp. 3d 235, 240 (S.D.N.Y. 2018) ("It is well-established that national security concerns affect the scope of due process.").

In *MG Altus Apache Co. v. United States*, 111 Fed. Cl. 425 (2013), for example, the Federal Court of Claims addressed the effect of national security concerns on the due process rights of a private contractor subject to a *de facto* debarment.  There, a Department of Defense vetting program used in Afghanistan had "rejected" the private defense contractor based on the discovery of derogatory intelligence that called into question the contractor's ethics and integrity.  *Id.* at 443.

In turn, the private contractor argued that this negative vetting designation effectuated a *de facto* debarment because it functionally disqualified the company from all Department of Defense contracts in Afghanistan.  *Id.*  The contractor argued further that this *de facto* debarment violated its due process rights because the Department of Defense had not afforded the company any notice of the derogatory vetting or an opportunity to respond.  *Id.* at 444.  But the Court of Federal Claims disagreed, emphasizing the unique impact of national security concerns on the private contractor's due process rights in that particular context:

> Although the vendor vetting rating process does not provide a contractor either notice of its ineligible status or an opportunity to present rebuttal evidence, requiring traditional due process in the CJ2X rating process would adversely affect national security. In the environment of a warzone when the required notice would necessarily disclose classified material and could compromise national security, normal due process requirements must give way to national security concerns. Not only would affording due process here require disclosure of classified information and endanger military intelligence sources, it would provide information to entities that pose a potential threat to the United States, thereby placing United States forces and operations at risk.

*Id.* at 444–45.  Because of these salient national security concerns within the Afghanistan theatre of war, the Court of Federal Claims determined that the defense contractor "was not entitled to receive formal notice of, or an opportunity to respond to, its vendor vetting rating."  *Id.* at 445.

The national security considerations in this case are immediately apparent and similar to those in *MG Altus Apache Co*.  Here, ACCL International is requesting notice of and an opportunity to respond to derogatory counterterrorism intelligence, presently classified at a Top Secret level.  *See* Farrell Decl., ECF No. 10-1, at ¶ 7.  Disclosing classified intelligence to ACCL International, a private foreign corporation, clearly implicates serious national security concerns. To start, "[t]he government has a compelling interest in protecting both the secrecy of information important to our national security and the appearance of confidentiality so essential to the effective operation of our foreign intelligence service."  *Snepp v. United States*, 444 U.S. 507, 509 n.3

(1980).   Moreover, the disclosure of the derogatory information on ACCL International may jeopardize the safety of State Department personnel in Afghanistan.   The derogatory information on ACCL International suggests that the company has "contracted with the enemy."   Ervin Decl., ECF No. 12-2, at ¶ 6.   Given that Afghanistan remains an active war zone presently enmeshed in a complex withdrawal of U.S. troops, the security concerns raised by this information are readily discernable.   These security concerns are only further compounded, given that ACCL International has contracted to work directly on diplomatic facilities in Kabul.   *See* Pirzada Decl., ECF No. 4-1, at ¶ 11 ("ACCL International uses its own drivers and vehicles to transport material from its warehouse in Kabul to the U.S. embassy there.").   Yet, throughout its preliminary injunction briefing, ACCL International has not addressed how the Court should approach these national security concerns when considering the contours of ACCL's putative due process rights.   *See* July 23, 2021 Min. Order (requesting briefing on constitutional due process issues).

In sum, ACCL International's *de facto* debarment claim derives from its constitutional due process rights, and the scope of those rights are far from clear on the current record.   As a threshold matter, ACCL's foreign status calls into question whether it possesses any Fifth Amendment due process rights at all.   And even if such rights exist, the amount of process constitutionally due to ACCL International in this case involves a complex question implicating serious national security concerns.   At the preliminary injunction stage, the Court need not resolve these questions.   Rather, it is sufficient to note that they present formidable obstacles to the success of ACCL International's *de facto* debarment claim, which ACCL International has not addressed with any specificity, despite direct prompting from this Court.   These unanswered due process questions present yet another reason why ACCL International has not established a "substantial likelihood of success on the merits."   *Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 913 (D.C. Cir. 2015).

## B.  Irreparable Harm

The Court next considers whether ACCL International has demonstrated "irreparable harm." *CityFed Fin. Corp. v. Office of Thrift Supervision*, 58 F.3d 738, 747 (D.C. Cir. 1995).  To constitute "irreparable harm," the injury alleged must be "both certain and great, actual and not theoretical, beyond remediation, and of such imminence that there is a clear and present need for equitable relief." *Mexichem Specialty Resins, Inc. v. EPA*, 787 F.3d 544, 555 (D.C. Cir. 2015) (quotation omitted).   And "[p]laintiffs seeking preliminary relief [must] demonstrate that irreparable injury is *likely* in the absence of an injunction." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008) (emphasis in original) (internal citations omitted).   "[P]ossibility of irreparable harm" is not enough.  *Id.*   "[P]roving 'irreparable' injury is a considerable burden, requiring proof that the movant's injury is 'certain, great and actual—not theoretical—and imminent, creating a clear and present need for extraordinary equitable relief to prevent harm.'" *Power Mobility Coal. v. Leavitt,* 404 F. Supp. 2d 190, 204 (D.D.C. 2005) (quoting *Wis. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985)).

To establish irreparable harm here, ACCL International points to four potential sources of injury: (1) the violation of ACCL's due process rights, (2) ACCL's *de facto* debarment, (3) ACCL's non-recoverable economic losses, and (4) ACCL's potential dissolution as a company. *See* Pls.' Reply at 20–23.  As explained below, the Court ultimately finds these grounds insufficient at the preliminary injunction stage to satisfy ACCL International's considerable burden of clearly demonstrating a likelihood of certain and imminent harm absent an injunction.

*First*, the Court is unpersuaded by ACCL International's attempt to show irreparable injury by pointing to the alleged violation of ACCL International's constitutional due process rights.  *See* Pls.' Reply at 21.  As described in detail above, ACCL International is a foreign entity based in

Afghanistan, *see* disc. *supra* at 30, and "[a] foreign entity without property or presence in this country has no constitutional rights, under the due process clause or otherwise." *People's Mojahedin Org. of Iran v. U.S. Dep't of State*, 182 F.3d 17, 22 (D.C. Cir. 1999). The Court specifically asked the parties to address this issue in its July 23, 2021 Minute Order, and in response the State Department took the position that "Plaintiffs [are] nonresident aliens without connections to the United States" and, therefore, "do not possess due process rights." Def.'s Reply at 17. ACCL International has presented no countervailing argument, nor has it pointed to any record evidence that might support the existence of its due process rights. Accordingly, the Court finds that ACCL International cannot now rely on its unestablished due process rights to demonstrate irreparable harm for the purposes of a preliminary injunction.

*Second*, the Court is similarly unpersuaded by ACCL International's argument that "debarment constitutes an irreparable injury." Pls.' Reply at 21. To begin, this argument assumes that a debarment took place. But as explained above, ACCL International has not demonstrated with sufficient certainty that the State Department effectuated a *de facto* debarment against it. *See* disc. *supra* at 16–25. Moreover, it goes too far to broadly assume that all debarments constitute irreparable injuries. In the normal course, debarment serves as a legitimate tool used by agencies to "exclude[] non-responsible contractors from government contracting." *Caiola v. Carroll*, 851 F.2d 395, 397 (D.C. Cir. 1988). Instead, ACCL's argument appears to assert that an *improper* debarment constitutes an irreparable injury. *See* Pls.' Reply at 21–22. But this position presumes both that ACCL International was debarred *and* that this debarment was improper. Because neither proposition is sufficiently clear on the present record, the Court finds that ACCL International cannot show irreparable harm merely by pointing to its yet unsubstantiated *claim* of a potentially unlawful debarment.

ACCL International's final two sources of irreparable harm blend together. ACCL International's *third* source of putative injury rests on the argument that because the State Department is immune from a suit for economic damages, those damages are irretrievable and, consequently, irreparable *per se*. *Id.* at 22. "This issue often arises in suits against government defendants, where sovereign immunity or other laws or doctrines may preclude monetary relief." *Save Jobs USA v. U.S. Dep't of Homeland Sec.*, 105 F. Supp. 3d 108, 114 (D.D.C. 2015). Courts in this jurisdiction, however, have rejected the broad position that *any* non-recoverable damages against a government defendant qualify as irreparable *per se*. *See, e.g.*, *Xiaomi Corp. v. Dep't of Def.*, No. CV 21-280 (RC), 2021 WL 950144, at \*10 (D.D.C. Mar. 12, 2021); *Air Transp. Ass'n of Am., Inc. v. Exp.–Imp. Bank of the U.S.*, 840 F. Supp. 2d 327, 336 (D.D.C. 2012); *Nat'l Min. Ass'n v. Jackson*, 768 F. Supp. 2d 34, 52 (D.D.C. 2011). Instead, the "wiser formula requires that the economic harm be significant, even where it is irretrievable because a defendant has sovereign immunity." *Air Transp. Ass'n*, 840 F. Supp. 2d at 336. In the case of a corporation seeking a preliminary injunction, the movant must still make "a strong showing that the economic loss would significantly damage its business, . . . would cause extreme hardship to the business, or even threaten destruction of the business." *Id.* (citations omitted). In this way, therefore, ACCL International's *third* source of harm (*i.e.*, non-recoverable damages that are *per se* irreparable) merges with the company's *fourth* and final source of harm, which is that the State Department's *de facto* debarment "threaten[s] ACCL International's very existence." Pls.' Reply at 23.

The question of ACCL International's case for irreparable harm then, ultimately turns on whether the company has adequately established that severe and imminent economic injury is "likely" absent a preliminary injunction. *Winter*, 555 U.S. at 22. "For [such] economic harm to constitute irreparable injury," ACCL International "must 'adequately describe and quantify the

level of harm it[] . . . face[s]." *Air Transp. Ass'n*, 840 F. Supp. 2d at 336 (quoting *Nat'l Ass'n of Mortg. Brokers v. Bd. of Governors of Fed. Rsrv. Sys.*, 773 F. Supp. 2d 151, 181 (D.D.C. 2011)). In this case, ACCL International attempts to do so by explaining that 80% of its annual revenue and 90% of its total gross margin is attributable to the company's subcontracts with DynCorp and PAE. *See* Pirzada Suppl. Decl., ECF No. 12-1, at ¶¶ 3–4. Accordingly, ACCL contends that "as a result of the State Department's *de facto* debarment and the termination of the PAE and DynCorp subcontracts, ACCL International expects to lose at least $30 million in the next year alone, and $120 million over the course of the next four years." Pls.' Reply at 22. Based on these projected revenue losses, ACCL International "anticipates having to cease business operations no later than the end of 2021." Pirzada Decl., ECF No. 4-1, at ¶ 22.

At first glance, ACCL International's base line economic forecasts appear substantial. Upon a closer review, however, the current record reveals two sources of ambiguity that call into question the certainty of ACCL's projected economic harm. The first source of ambiguity relates to the apparent *methodology* behind ACCL's forecasted economic losses. Again, ACCL projects losses of $30 million in the next calendar year and $120 million over four years, based on its revenue losses from subcontracts with DynCorp and PAE. But how exactly did ACCL International calculate these totals? The record indicates that only one source of projected revenue loss comes from the *termination* of a *current* subcontract. Specifically, on May 20, 2021, PAE terminated its subcontract with ACCL International for the SaSS Task Order. *See* Pirzada Suppl. Decl., ECF No. 12-1, at ¶ 10. As a result of this termination, ACCL International has lost approximately $70,000 in billing per month. *Id.* at ¶ 11. Therefore, because the SaSS subcontract with PAE was scheduled to continue through September 18, 2021, ACCL International can reasonably claim future losses of approximately $175,000 in monthly billing, during the period

between the date of its preliminary injunction motion (June 30th) through the end of the SaSS subcontract's current term (September 18th).

The remaining portion of ACCL International's projected revenue loss, however, derives from ACCL's *anticipated* subcontracts with DynCorp and PAE. First, ACCL projects a loss of approximately $117 million over five years ($23.4 million per annum) because it will not receive a subcontract with DynCorp for the new ALiSS prime contract in Afghanistan, which is set to begin on August 20, 2021 and carry four option years. *Id.* at ¶ 7. ACCL then notes that it had options with PAE "to extend the SaSS subcontract through 18th March 2024" and the termination of its SaSS subcontract, therefore, will result "in an expected loss of USD 3.5 million . . . in revenue that would have been made under the SaSS subcontract between May 2021 and May 2022." *Id.* at ¶ 12. Similarly, ACCL International states that its O&M subcontracts with PAE also had option years through March 18, 2024, and that ACCL's inability to perform on these option year subcontracts will result "in an expected loss of USD 3.5 million . . . in revenue that would have been made between 19th September 2021 and 18th March 2024." *Id.* ¶ 15.

Altogether then, ACCL International has only shown that around $175,000 of its projected revenue loss, calculated from the time of its motion for a preliminary injunction, is tied to a current contract. The remainder of ACCL's projected revenue loss of $120 million over the next four years ostensibly relies on *anticipated* losses the company *expects* to sustain based on subcontracts it *hopes* to renew with DynCorp and PAE. In fact, almost the entirety of ACCL International's projected loss derives solely from the $117 million in revenue the company expects to receive from the renewed ALiSS contract with DynCorp. *See id.* at ¶ 7. But it is not certain, on the present record, whether ACCL International would have been entitled to this contract revenue. ACCL indicates that the "State Department will soon award a renewal" of the five-year ALiSS prime

contract in Afghanistan, and because DynCorp and ACCL International "are the incumbents" on the earlier ALiSS contract they "were expected to continue in their roles." *Id.* Yet, the Court cannot simply assume, based on ACCL's "expectation," that the State Department will award the new ALiSS prime contract to DynCorp, or that DynCorp would have selected ACCL again as a subcontractor for its bid on the new ALiSS prime contract. *See, e.g.*, *Figg Bridge Engineers, Inc. v. Fed. Highway Admin.*, No. CV 20-2188 (CKK), 2020 WL 4784722, at *7 (D.D.C. Aug. 17, 2020) ("[T]here is no guarantee that Figg, particularly as a likely subcontractor, would, in fact, participate or succeed in a bid for any given contract."). And finally, there is no certainty that the State Department will exercise every option year for DynCorp on the new ALiSS prime contract, or that DynCorp would have exercised each of ACCL International's option years as a subcontractor thereunder. *See Hi-Shear Tech. Corp. v. United States*, 55 Fed. Cl. 418, 423 (2003), *aff'd*, 356 F.3d 1372 (Fed. Cir. 2004) ("The unique function of an option contract is that it obligates the option giver, not the option holder. It does not create a legal obligation . . . to exercise the option."). For these reasons, the Court finds that the methodology behind ACCL International's projected economic losses is demonstrably speculative, as it relies heavily on hypothetical revenue derived from subcontracts the company has not yet received.

The second ambiguity clouding ACCL International's case for irreparable harm relates to the *overall effect* that its projected revenue losses would have on the company and its prospective viability. ACCL International's theory of irreparable harm is tied to the loss of its contracts with DynCorp and PAE in Afghanistan. *See* Pirzada Suppl. Decl., ECF No. 12-1, at ¶¶ 3–15. But even assuming that the DynCorp and PAE contracts do represent a substantial source of lost revenue for ACCL International, the record suggests that ACCL International might offset these losses with new or preexisting revenue streams. For example, the company is currently preparing

subcontract bids for the "Baghdad Life Support Services ("BLiSS") contract, which is nearly four times the size of the ALiSS contract." Pirzada Decl., ECF No. 4-1, at ¶ 18. And contrary to ACCL International's assertion, the record does not indicate with any certainty that the company will be barred from bidding on the BLiSS contract. *See* Stever Decl., ECF No. 10-5, at ¶ 14. Furthermore, ACCL International's motion papers reference additional business that the company is pursuing with NATO in Germany, *see* Pirzada Decl., ECF No. 4-1, at ¶ 19, as well as potential projects for ACCL International in East Africa, Kuwait, and Qatar, *id.* at ¶ 18. And, as explained above, *see* disc. *supra* at 16–25, the present record does not clearly demonstrate that ACCL International will be unable to compete for or participate in such projects going forward. Consequently, these projects outside of Afghanistan might well serve as alternative sources of revenue for ACCL International, which could sustain the company's financial viability going forward.

In brief, the present record reflects significant ambiguities surrounding the nature and scope of ACCL International's purported injury. In particular, ACCL International's theory of economic harm relies heavily on speculative revenue streams, while also discounting the company's ability to offset such losses in the future. ACCL International, therefore, has not sufficiently demonstrated an irreparable injury that is both certain and imminent in the absence of a preliminary injunction. *Mexichem Specialty Resins, Inc. v. EPA*, 787 F.3d 544, 555 (D.C. Cir. 2015).

## C.  Balance of the Equities and the Public Interest

"The final two factors the Court must consider when deciding whether to grant a preliminary injunction are the balance of harms and the public interest." *Sierra Club v. United States Army Corps of Engineers*, 990 F. Supp. 2d 9, 41 (D.D.C. 2013). Where, as here, the government is a party to the litigation, these two factors merge and are "one and the same, because the government's interest is the public interest." *Pursuing Am.'s Greatness v. Fed. Election*

*Comm'n*, 831 F.3d 500, 511 (D.C. Cir. 2016).  "Although allowing challenged conduct to persist certainly may be harmful to a plaintiff and the public, harm can also flow from enjoining an activity, and the public may benefit most from permitting it to continue."  *Sierra Club*, 990 F. Supp. 2d at 41.  Therefore, when "balanc[ing] the competing claims of injury," the Court must "consider the effect on each party of the granting or withholding of the requested relief."  *Winter*, 555 U.S. at 24.

ACCL International has not demonstrated that the balance of the equities and the public interest weigh in its favor.  In its motion, ACCL International points generally to "the significant harm to ACCL International absent injunctive relief."  Pls.' Mot. at 10; *see also* Pls.' Reply at 23–25.  ACCL International also asserts, without explanation, that "the harm to the Government from issuing such an injunction would be slight at best."  Pls.' Mot. at 10.  Finally, ACCL International appeals to the public's general interest in ensuring that the government "abide by the federal laws that govern their existence and operations."  *Id.* (quoting *League of Women Voters v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016)); *see also* Pls.' Reply at 23–25.

These arguments are unpersuasive.  As an initial matter, ACCL International's reliance on the State Department's purported violation of the law is undercut by ACCL's inability to show a likelihood that the State Department, in fact, violated either the federal debarment regulations or ACCL's due process rights.  *See* disc. *supra* at 16–33.  Similarly, the harm ACCL International relies upon is speculative, given the present record.  *See* disc. *supra* at 34–39.  More fundamentally, however, ACCL International's balancing of the equities fails to directly engage with the State Department's position and the broader public interests at play.  Namely, ACCL's argument does not account for the potentially grave effect that a preliminary injunction would have on the State Department in Afghanistan.  Following the Supreme Court's instruction, however, this Court must

take pains to "consider the effect on [the State Department] of granting . . . the requested relief."
*Winter*, 555 U.S. at 24.

The State Department's challenged conduct in this case resulted from the discovery of derogatory information on ACCL International through a counterterrorism vetting program aimed at the prevention of inadvertent terrorist financing.  *See* Farrell Decl., ECF No. 10-1, at ¶ 7; Merrill Decl., ECF No. 10-4, at ¶ 3.  This derogatory information indicated that ACCL International had potentially "contracted with the enemy."  Ervin Decl., ECF No. 12-2, at ¶ 6.  The information was also of sufficient importance and sensitivity to merit a Top Secret level classification.  *See* Farrell Decl., ECF No. 10-1, at ¶ 7.  And based on the State Department's risk assessment of this derogatory counterterrorism material, the State Department ultimately determined that ACCL International should not be used as a subcontractor for select contracts in Afghanistan, including contracts connected to work on the United States Embassy in Kabul.  *See* Merrill Decl., ECF No. 10-4, at ¶¶ 1–6.

Under these circumstances, the Court cannot agree with ACCL International's assessment that the effect of a preliminary injunction on the State Department would be "slight at best."  Pls.' Mot. at 10.  To the contrary, such an injunction would threaten the confidentiality of classified intelligence, undermine the State Department's ability to make region-specific risk assessments in furtherance of personnel security, and thwart the Department's effort to prevent inadvertent terrorist support.  These concerns are especially pronounced here, given the State Department's current diplomatic role in Afghanistan at a time when the U.S. military is undertaking a full-scale troop withdrawal.

Correspondingly, there is a clear public interest associated with preserving the nation's diplomatic security abroad and limiting the possibility of inadvertent terrorist financing through

government contracts.  As such, the potential "effect on [the State Department] of the granting . . . the requested relief" is significant and implicates substantial matters of diplomatic security and foreign affairs.  *Winter*, 555 U.S. at 24; *see also Holder v. Humanitarian L. Project*, 561 U.S. 1, 33–34 (2010) ("That evaluation of the facts by the Executive . . . is entitled to deference.  This litigation implicates sensitive and weighty interests of national security and foreign affairs.").  For these reasons, the Court finds that the balance of the equities and the public interest do not weigh in favor of ACCL International's request for a preliminary injunction.

## IV.    CONCLUSION

For the reasons set forth in this Memorandum Opinion, the Court concludes that ACCL International has failed to satisfy its burden of demonstrating that it is entitled to preliminary injunctive relief.  Accordingly, the Court shall **DENY** ACCL International's Motion for a Preliminary Injunction.  An appropriate Order accompanies this Memorandum Opinion.

**Dated**: August 6, 2021

_____/s/_____
COLLEEN KOLLAR-KOTELLY
United States District Judge